UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

RANDY SCOTT LINGELBACH, JR.,

                Plaintiff,

v.                                         Case No. 3:19-cv-457-BJD-MCR

JASON SMITH, et al.,

                Defendants.

_____

## **ORDER**

### **I. Status**

Plaintiff, Randy Scott Lingelbach, Jr., an inmate of the Florida penal system, is proceeding pro se on an amended complaint for the violation of civil rights against one Defendant, Officer Jason Smith (Doc. 7; Am. Compl.).[1] Before the Court is Defendant Smith's motion for summary judgment (Doc. 37; Motion), which he supports with video and documentary exhibits (Docs. 36-1 through 36-37; Def. Exs. 1-37). Plaintiff has responded to the motion (Doc. 57; Pl. Resp.) with supporting exhibits consisting of his own declaration, and Defendant Smith's and former Defendants' responses to his discovery requests

_____

[1] The Court previously granted Defendants Lee and Kopinski's motion for summary judgment. See Order (Doc. 69).

(Docs. 58-1 through 58-7; Pl. Exs. A-G). With the Court's permission, Defendant Smith filed a limited reply (Doc. 68; Reply).

## II. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations

2

(including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

When the moving party has discharged its burden, the non-moving party must point to evidence in the record to demonstrate a genuine dispute of material fact. Id. Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing [the motion]." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

### III. Complaint Allegations & Evidence

Plaintiff alleges Defendant Smith used excessive force by shooting him after Plaintiff robbed a Walmart store and engaged officers in a car chase in Fernandina Beach on April 27, 2015. See Am. Compl. at 5-6. Plaintiff asserts the car chase ended with Plaintiff's vehicle—a pick-up truck—skidding into a ditch. Id. at 6. Once the truck was in the ditch, Plaintiff alleges, Defendant Smith approached and opened the driver's door, but the door shut on its own because of the angle at which the truck was positioned. Id. According to

3

Plaintiff, after the driver's door closed, Defendant Smith "stepped back . . . and fired two rounds from his service firearm." Id. Both shots hit Plaintiff in the head. Id. at 7. Plaintiff explicitly alleges, "At no time after Plaintiff ended up in the ditch did Plaintiff rev [the engine] or attempt to get out of the ditch before getting shot by Defendant Smith." Id. at 6. Plaintiff further alleges that officers tased him after they removed him from the truck. Id. at 7.[2]

The parties primarily agree on the sequence of events that led to Plaintiff being shot. Records show that, after Plaintiff roamed around Walmart for about two hours, he left through the entrance with a shopping cart containing an unpurchased forty-three-inch television from which Plaintiff had removed the anti-theft device. See Def. Ex. 20 at 2.[3] As Plaintiff exited the store, Walmart loss-prevention officers approached Plaintiff, who became "hostile." Id. One officer grabbed Plaintiff, but Plaintiff threatened to stab him with a "sharp" object, which Plaintiff swung in the direction of the Walmart officers and a customer who attempted to help subdue Plaintiff. Id.; See also Def. Ex.

---

[2] Plaintiff does not allege which officer tased him, see Am. Compl. at 7, and at deposition, he testified he could not be sure he was tased, see Def. Ex. 13 at 78, 84. In response to Defendant Smith's motion, Plaintiff offers no evidence showing he was tased at the scene, and he appears to have abandoned that claim. See Pl. Resp. at 3, 6.

[3] Referenced page numbers for exhibits are those assigned by the Court's electronic case management system, not any internal numbering a document may contain.

34 at 5. The officers did not further pursue Plaintiff, who then retrieved the shopping cart and walked away. See Def. Ex. 20 at 2. Plaintiff unloaded the television into the bed of a black Dodge Ram pick-up truck and drove out of the parking lot "in a reckless manner, driving over a curb and grass." Id. See also Def. Ex. 17.

A Walmart employee called 911 reporting that an "armed robbery" was in progress, and she pleaded with the 911 operator to have the officers "hurry." See Def. Ex. 17; Def Ex. 20 at 1. The caller said the robber assaulted two Walmart employees and a customer and threatened to "cut" one of the employees while he was holding "something in his hand."[4] See Def. Ex. 17. Officers with the Fernandina Beach Police Department (FBPD) responded to the call. Defendant Smith and Officer Kopinski, who were the first two officers to respond, wrote in their respective reports that the dispatch operator said the robbery suspect "was armed with a knife" and had assaulted people at Walmart. See Def. Ex. 8 at 14, 23, 28, 31; Def. Ex. 18 ¶3.

Defendant Smith, driving his police cruiser, was near Walmart when he heard the call. See Def. Ex. 8 at 14. As he approached Walmart, Defendant

---

[4] The sharp item Plaintiff wielded turned out to be a hypodermic syringe, which paramedics found in his pants pocket before transporting him to the hospital after the shooting. See Def. Ex. 8 at 11, 31-32.

Smith saw a black Dodge Ram pick-up truck travel across some grass, a sidewalk, and the curb and fishtail onto the road just in front of him. See Def. Ex. 18 ¶¶ 5, 6. Defendant Smith pursued the truck with his lights and siren activated. Id. ¶¶ 7, 8; Def. Ex. 20 at 3. Defendant Smith later reported that Plaintiff was driving "in a reckless manner, fishtailing, and weaving in and out of traffic." See Def. Ex. 20 at 3. See also Def. Ex. 8 at 39, 40; Def. Ex. 17; Def. Ex. 34 at 5. Plaintiff drove through another business parking lot "at a high rate of speed"; ran two red lights; drove up to eighty miles per hour in a thirty mile per hour residential area; ran a stop sign; and barreled through construction-zone barricades. See Def. Ex. 18 ¶¶ 6, 12; Def. Ex. 20 at 3. Defendant Smith avers that Plaintiff almost hit a pedestrian during the pursuit. See Def. Ex. 18 ¶ 11.

At a dead-end on Bonnieview Road, Plaintiff pulled over and came to a brief stop. Id.; See also Def. Ex. 19; Def. Ex. 34 at 5. Defendant Smith stopped to the right of the truck's passenger side, and Officer Kopinski stopped behind the truck. Both officers had their lights and sirens activated. See Def. Ex. 18 ¶ 17; Def. Ex. 19; Def. Ex. 20 at 3. Plaintiff immediately reversed and quickly turned back the way he had come, driving in the direction of Officer Kopinski's marked police car. See Def. Ex. 20 at 3. Officer Kopinski, who was in the process of stepping out of his vehicle had to "dive back into his vehicle to avoid

6

being struck by [Plaintiff]." <u>Id</u>. <u>See also</u> Def. Ex. 14. Officer Kopinski told investigators with the Florida Department of Law Enforcement (FDLE) that Plaintiff nearly hit him. <u>See</u> Def. Ex. 14. Plaintiff was driving so fast that the "force or speed of [his driving] . . . pushed the driver's door of Kopinski's patrol vehicle closed." <u>See</u> Def. Ex. 9 at 4.

Defendant Smith fired four shots at the rear windshield of the truck as Plaintiff was driving toward Officer Kopinski's car because Smith feared Plaintiff "was about to hit or run over Officer Kopinski." <u>See</u> Def. Ex. 18 ¶ 19; Def. Ex. 19. Plaintiff concedes Defendant Smith's fear that Plaintiff would hit officer Kopinski was "reasonable." <u>See</u> Am. Compl. at 6. After Defendant Smith fired those initial shots, Plaintiff executed another U-turn. <u>See</u> Def. Ex. 18 ¶¶ 21, 22. The truck slid off the road into a drainage ditch, but Plaintiff continued "pressing the accelerator and rocking the vehicle forward and backward" in what Defendant Smith and other officers perceived to be an attempt to continue his escape. <u>Id</u>. ¶ 22. <u>See also</u> Pl. Ex. C at 20; Pl. Ex. E ¶ 33; Pl. Ex. F ¶ 48. Plaintiff's truck was facing both Defendant Smith and Officer Kopinski, who were both on foot. <u>See</u> Def. Ex. 14; Def. Ex. ¶ 21.

Contrary to the allegation in his complaint, Plaintiff now concedes that when his truck landed in the ditch, he "'gunned' the engine in an effort to" continue fleeing from police because he believed Defendant Smith, who was

walking toward the vehicle with his weapon drawn, was intent on "murdering him." See Pl. Resp. at 2, 16-17. Plaintiff contends, however, that he was no longer a threat to officers or the public because the passenger-side tires were stuck in the ditch and were only spinning. Plaintiff says, "[he] was not engaged in active flight – the truck was stationary." Id. at 16.

When Plaintiff's truck was in the ditch, Defendant Smith approached the driver's door, but he could not see inside because the windows were "heavily tinted."[5] See Def. Ex. 18 ¶ 22. Plaintiff contends Defendant Smith "ran over and opened the door." See Def. Ex. 13 at 74. At deposition, Plaintiff testified as follows: "[Smith] looked inside [the truck]. He didn't say nothing. He just had this look on his face, and then he shut the door, and he stepped back and then he shot through the window." Id. Defendant Smith denies having opened the door before shooting, though he accepts the fact "for purposes of this motion." See Reply at 2 n.1.

Plaintiff alleges "Defendant Smith did not issue any verbal commands or orders" before shooting him in the head. See Am. Compl. at 5.  Defendant

_____

[5] The other officers involved agree it was impossible to see inside the truck from where they were positioned because the windows were so dark. See Def. Ex. 8 at 41; Def. Exs. 14, 15. In fact, Officer Lee described the window tint as a "mirror," showing only a reflection. See Def. Ex. 8 at 41; Def. Ex. 15. Plaintiff himself acknowledges it was not possible to see through the side windows. See Am. Compl. at 8; Def. Ex. 13 at 119.

Smith disputes this allegation. He avers that, before shooting into the truck, he gave "multiple verbal commands [to Plaintiff] to stop the vehicle," which Plaintiff ignored. See Def. Ex. 18 ¶ 22. Because the Court must construe the facts in the light most favorable to Plaintiff, the Court accepts that Defendant Smith did not issue any oral warnings to Plaintiff before shooting him.

After shooting into the truck, Defendant Smith opened the driver's door to discover a female passenger inside with Plaintiff. See Def. Ex. 20 at 3. The passenger told officers she and Plaintiff had been awake for several days "on a meth binge," id., and that Plaintiff had injected himself with meth just before entering Walmart, see Def. Ex. 9 at 6. The truck was registered to a different woman, who reported it stolen the following day.[6] See Def. Ex. 20 at 4; Def. Ex. 34 at 6. Sergeant Hamilton, who arrived at the scene moments after Defendant Smith shot Plaintiff, reported that Smith said, "I shot him . . . Sarge, he tried to run over me!" See Def. Ex. 8 at 31.

Plaintiff was air-lifted to Shands Hospital. See Def. Ex. 34 at 5. Before transporting Plaintiff, paramedics found a syringe in his pocket. Id.

---

[6] Plaintiff testified at deposition that a friend paid him money to drive the female passenger from Georgia to Florida. See Def. Ex. 13 at 50. The friend also loaned Plaintiff the truck, which the friend "rented" from a guy in exchange for drugs. Id. at 148.

Additionally, a knife was found on the ground close to the truck, though it is unclear whether the knife belonged to Plaintiff. See Def. Ex. 9 at 8.

Defendant Smith explains why he believed deadly force was necessary: "The fact that [Plaintiff] did not submit to my authority after I initially deployed my weapon only confirmed my belief that [he] would take whatever action he felt was necessary to evade capture and arrest." See Def. Ex. 18 ¶ 24. Defendant Smith avers he believed his life, the life of the other officers, and the lives of civilians were at risk if Plaintiff had been "successful in his attempt to reinitiate his flight and pursuit." Id. ¶ 25. See also Def. Ex. 12 at 3.

Defendant Smith's dash-cam captured most of the pursuit but not the shooting because when Defendant Smith exited his patrol car at the end of Bonnieview Road, the car was facing away from subsequent events.[7] See Def. Ex. 19. A report prepared by the Office of the State Attorney noted the chase "lasted more than three minutes and extended a distance of approximately two miles." See Def. Ex. 9 at 4. State Attorney Angela B. Corey found Defendant Smith's use of deadly force was justified because Smith knew Plaintiff had forcibly robbed a store, may have been armed with a knife, attempted to hit a

---

[7] Officer Kopinski's dash-cam was not working that day. See Def. Ex. 9 at 4.

police officer, drove recklessly for about two miles, and refused to surrender even after two police cars with lights and sirens pursued him. Id. at 9.

The FBPD reviewed Defendant Smith's use of force following the incident. See Def. Ex. 8 at 2. A deputy reviewed reports prepared by other FBPD officers, the FDLE, and the State Attorney's Office, and concluded there was "solid evidence . . . that Officer Smith acted within the scope of the [FBPD] General Orders governing the use of deadly force." Id.

At deposition, Plaintiff denied having taken meth or any other drugs before entering Walmart on the day of the incident. See Def. Ex. 13 at 51. However, when interviewed by FDLE agents only days after the incident, Plaintiff conceded he had shot up with "ice" (meth) the night before the incident, not long before he left Georgia for Fernandina Beach. See Def. Ex. 10. Additionally, Plaintiff later attributed his actions to having been on drugs that day. See Def. Ex. 35 at 23. When asked why Plaintiff believed Defendant Smith's conduct constituted excessive force, Plaintiff suggested Smith should have used a taser gun, pepper spray, baton, or rubber bullets instead of resorting to the use of deadly force. See Def. Ex. 13 at 82.[8]

---

[8] Plaintiff also testified that Defendant Smith's initial shots constituted excessive force. See Def. Ex. 13 at 82-83. Plaintiff has abandoned that claim, however. In his response to the motion, Plaintiff concedes the initial shots "were justified" because he nearly hit Officer Kopinski. See Pl. Resp. at 13.

Plaintiff was charged by amended information with armed robbery; aggravated fleeing or attempting to elude a law enforcement officer; and aggravated assault on a law enforcement officer with a deadly weapon (a vehicle). See Def. Ex. 22 at 1. On November 12, 2015, with the assistance of counsel, Plaintiff withdrew his previously entered not-guilty plea and pled guilty. See Def. Ex. 4 at 3. The judge accepted his plea based on the factual basis set forth in the arrest warrant affidavit. Id. at 9. The judge sentenced Plaintiff to twenty years in prison. See Def. Ex. 11 at 6.

At Plaintiff's sentencing hearing, he read from a letter he had written to apologize for his actions. See Def. Ex. 35 at 23. Plaintiff acknowledged he displayed "irrational, lawless, erratic, impulsive, and self-destructive behaviors," which he attributed to being on drugs and not taking his prescribed psychotropic medications. Id. Plaintiff said, "On that morning I was intoxicated, delusional, in the state of paranoia and psychosis." Id. Plaintiff expressed deep remorse and accepted "full responsibility for [his] actions and reactions." Id. at 24. He also thanked the officers and first responders for saving his life. Id. at 25. In addition to expressing his remorse in open court, Plaintiff wrote letters of apology to Defendant Smith and other officers as well as to Walmart employees. Id. at 31.

Plaintiff's attorney summarized for the sentencing court the injuries Plaintiff sustained and further noted Plaintiff acknowledged his actions were responsible for those injuries:

> [A]s a result of what happened on that day he's got some injuries that he's going to deal with for the rest of his life . . . and he knows that his actions were ultimately what caused that. He's lost vision in one of his eyes, he no longer can – or no longer has a sense of smell, he's lost his sense of taste, he has some short-term memory issues, and he understands that those were caused by, or ultimately his actions are what led to that, and he is prepared to go forward with his life and deal with them as he has to.

Id. at 32. In addition to the injuries Plaintiff's attorney reported at his sentencing hearing, Plaintiff explained at deposition that he lost his eye, suffers from daily headaches or discomfort in his face and head, and sometimes has drainage from his ears and eyes. See Def. Ex. 13 at 90-92. Plaintiff's surgeon told him he will need additional surgeries. Id. at 91.

## IV. Analysis & Conclusions

Defendant Smith asserts three arguments in support of summary judgment: that Plaintiff's claim is Heck[9]-barred; that his use of force was

---

[9] In Heck v. Humphrey, 512 U.S. 477, 487 (1994), the Supreme Court held a state prisoner's claim for damages "is not cognizable under § 1983 . . . . [if] a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." Cases barred by Heck "are typically dismissed without prejudice" subject to the plaintiff's right to re-

objectively reasonable; and that he is entitled to qualified immunity. See Motion at 7, 13, 20. Regardless of whether Heck bars Plaintiff's claim, the Court finds Defendant Smith is entitled to qualified immunity because Plaintiff fails to establish the violation of a clearly established constitutional right.[10]

An officer sued in his individual capacity "is entitled to qualified immunity for his discretionary actions unless he violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Black v. Wigington, 811 F.3d 1259, 1266 (11th Cir. 2016) (quoting Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009)). Qualified immunity allows officers to exercise their official duties without fear of facing personal liability. Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018). The doctrine protects "all but the plainly incompetent" or those who knowingly violate a person's constitutional rights. Id.

---

initiate a civil action if his criminal conviction is later invalidated. See Petersen v. Overstreet, 819 F. App'x 778, 779 (11th Cir. 2020).

[10] Heck deprives a plaintiff of a cause of action; it does not necessarily strip a district court of jurisdiction. See Harrigan v. Metro Dade Police Dep't Station #4, 977 F.3d 1185, 1191 n.4 (11th Cir. 2020). See also Teagan v. City of McDonough, 949 F.3d 670, 678 (11th Cir. 2020) (suggesting, without deciding, that Heck is more akin to an affirmative defense, not a jurisdictional rule).

14

Upon asserting a qualified immunity defense, a defendant bears the initial burden to demonstrate he was acting in the scope of his discretionary authority at the relevant times. <u>Dukes v. Deaton</u>, 852 F.3d 1035, 1041-42 (11th Cir.), <u>cert. denied</u>, 138 S. Ct. 72 (2017). If the defendant carries his burden, the burden shifts to the plaintiff who must demonstrate two elements: the defendant's conduct caused him to suffer a constitutional violation, and the constitutional violation was "clearly established" at the time. <u>Alcocer</u>, 906 F.3d at 951.

It is undisputed Defendant Smith was acting in the scope of his discretionary authority at the relevant times. Thus, the burden shifts to Plaintiff to demonstrate Defendant Smith violated a constitutional right that was clearly established. "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." <u>See</u> <u>McCullough v. Antolini</u>, 559 F.3d 1201, 1205 (11th Cir. 2009) (quoting <u>Lee v.</u> <u>Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002)).

Whether an officer used excessive force when arresting a suspect is analyzed "under the Fourth Amendment's objective reasonableness standard." <u>Id.</u> at 1205-06 (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 388 (1989)). The Supreme Court has articulated a fact-specific test courts must apply when balancing an arrestee's Fourth Amendment interests against the

governmental interests at stake. <u>Graham</u>, 490 U.S. at 396. Relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." <u>Id.</u> These factors must be considered from the "perspective of a reasonable officer on the scene." <u>Id.</u> Importantly, "[t]he calculus of reasonableness must [allow] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation." <u>Id.</u> at 396-97.

In analyzing whether an officer is entitled to qualified immunity, his conduct is "judged against the backdrop of the law at the time." <u>Brosseau v. Haugen</u>, 543 U.S. 194, 198 (2004). In 2015, the Supreme Court recognized that it had "never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity." <u>Mullenix v. Luna</u>, 577 U.S. 7, 8, 14-15 (2015) (reversing the district court's denial of qualified immunity to an officer who used deadly force to end an eighteen-minute, twenty-five-mile, high-speed car chase on an interstate). <u>See also</u> <u>Scott v. Harris</u>, 550 U.S. 372, 386 (2007) ("A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives

of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death.").

In 2014, the Supreme Court analyzed qualified immunity in the context of a "dangerous car chase" strikingly similar to the one at issue here. Plumhoff v. Rickard, 572 U.S. 765, 768 (2014). In Plumhoff, an officer stopped a suspect for a non-dangerous offense—having a headlight out. After asking some questions and seeing a large indentation in the windshield, the officer became suspicious and asked the suspect to exit his car. Id. at 769. The suspect did not comply and sped away. Id. The officer and five others engaged the suspect in a chase that lasted over five minutes and reached speeds of over 100 miles per hour. Id. at 769, 776. The suspect hit at least three police cruisers, one of which caused the suspect's car to stop momentarily. Id. at 776.

When the suspect's car was at a near standstill, an officer fired three shots into the car. Those initial shots did not end the chase because the suspect was "obviously pushing down on the accelerator [and] the car's wheels were spinning." Id. After the suspect started moving again, officers fired twelve more shots, causing the suspect to lose control and crash into a building. Id. at 770. The suspect and his passenger died. Id. In concluding the officers acted reasonably in using deadly force, the Court reasoned as follows:

> Under the circumstances at the moment when the
> shots were fired, all that a reasonable police officer

17

> could have concluded was that [the suspect] was intent
> on resuming his flight and that, if he was allowed to
> do so, he would once again pose a deadly threat for
> others on the road. [The suspect's] conduct even after
> the shots were fired—as noted, he managed to drive
> away despite the efforts of the police to block his
> path—underscores this point.

Id. at 777. Additionally, the Court held there was no clearly established law

that precluded the officer's conduct at the time. Id. at 779.

Similarly, the Eleventh Circuit has emphasized that it has "consistently

upheld an officer's use of force and granted qualified immunity in cases where

the [suspect] used or threatened to use his car as a weapon to endanger officers

or civilians immediately preceding the officer's use of deadly force."

McCullough, 559 F.3d at 1207. In McCullough, an officer attempted to initiate

a traffic stop because the suspect's window tint was too dark, and the officer

suspected the driver of having recently participated in a drug deal. Id. at 1202.

The suspect fled instead of pulling over. He traveled up to sixty miles per hour,

drove through an intersection, and pulled into a parking lot where he lost

control of the vehicle, causing it to fishtail, spin, and then stop. Id. at 1203.

Once the suspect was stopped, an officer exited his police cruiser,

approached the suspect's car, and ordered the suspect to show his hands. The

suspect did not comply. Id. After another officer arrived, the officers heard the

engine revving and the tires spinning. The officers each fired through the

driver's side window, but the suspect was able to reverse the car and flee, nearly hitting one of the officers in the process. Id. Both officers followed the suspect's vehicle on foot, firing more shots, and the suspect's car finally came to a stop. Id. at 1204. "The entire incident took place over a very short period of time": about twenty seconds. Id. at 1204 n.3. The suspect, who was unarmed, died at the scene. Id. The court held the use of deadly force was reasonable because of the suspect's "initial attempts to evade police, his failure to heed police warning of the potential use of deadly force, his later attempt to drive a truck towards an officer on foot, and his still later apparent attempt to drive away from officers toward the exit of the parking lot." Id. at 1208.

Applying the above legal principles, the Court finds Defendant Smith's conduct on April 27, 2015, was objectively reasonable. Additionally, there was no binding precedent in 2015 that would have alerted Defendant Smith his use of deadly force was not justified under the rapidly evolving, dangerous circumstances he and other officers confronted that day. Defendant Smith knew Plaintiff was suspected of committing an armed robbery involving possible assault and, with that knowledge, observed Plaintiff drive recklessly for two miles, endangering the lives of other drivers, a pedestrian, and the officers pursuing him. Defendant Smith also observed Plaintiff drive through construction barricades and reach up to eighty miles per hour on a residential

street, nearly hit another officer with his truck, and attempt to continue his flight even after the truck skidded to what appeared to be a momentary stop. Under these circumstances and like the Eleventh Circuit held in a case with nearly identical facts, the use of deadly force was objectively reasonable to end the high-speed, dangerous car chase. See McCullough, 559 F.3d at 1207.

The facts here suggest Plaintiff posed even more of a threat than did the suspect in McCullough. In that case, the officers had no reason to believe the suspect was armed, nor had they received reports that the suspect had assaulted or attempted to harm anyone, id. at 1202, whereas here, the 911 dispatch operator relayed to officers that Plaintiff was believed to have a knife, which he had used to threaten Walmart employees, see Def. Exs. 16, 17. Additionally, Defendant Smith observed Plaintiff's reckless driving for almost two miles during which time Plaintiff endangered the lives of officers and others: he ran two red lights, one at a busy intersection; nearly hit a pedestrian; barreled through construction barricades on a residential street; and nearly hit an officer. The officers in McCullough, however, resorted to force after observing the suspect drive through an intersection and a parking lot. See 559 F.3d at 1203.

Notably, Plaintiff concedes Defendant Smith's initial shots were justified because Plaintiff almost hit Officer Kopinski. See Pl. Resp. at 13. However, he

20

contends, the subsequent two shots that struck him were not justified because the "truck was stationary and unable to extract itself from the ditch." <u>See</u> Pl. Resp. at 16. Thus, according to Plaintiff, he was no longer "gravely dangerous" at the time the second round of shots were fired. <u>Id.</u> at 7 (citing <u>Penley v. Eslinger</u>, 605 F.3d 843, 845, 851 (11th Cir. 2010) (holding an officer acted in an objectively reasonable manner when he used deadly force to subdue a student who threatened other students and officers with what later turned out to be a fake gun)).

Characterizing Defendant Smith's initial and subsequent series of shots as separate, isolated incidents, Plaintiff attempts to distinguish the <u>Plumhoff</u> case by arguing that any threat of continued flight ended when the truck landed in the ditch. <u>Id.</u> at 9 (citing <u>Plumhoff</u>, 572 U.S. at 777 (noting the outcome may have been different had the initial shots fired at the suspect "clearly incapacitated" him and "ended any threat of continued flight")). Plaintiff argues that the truck could not possibly have driven out of the ditch because the truck's tires were bald, and the ditch's angle was too steep. <u>Id.</u> at 14.

Plaintiff's suggestion that Smith's initial and final shots constitute separate, independent uses of deadly force is misguided. The suspect in the <u>Plumhoff</u> case advanced a similar argument, suggesting the firing of fifteen

shots was excessive, even if some force, initially, was justified. <u>See</u> 572 U.S. at 777. The Court rejected that argument, holding, "[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended. . . . [I]f lethal force is justified, officers are taught to keep shooting until the threat is over." <u>Id.</u> <u>See also</u> Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002) (holding the use of deadly force was reasonable under the circumstances because the suspect's "car was stopped for, at most, a very few seconds when shots were fired[, meaning] no cooling time had passed for the officers in hot pursuit").

Upon review of the dash-cam video, only about thirteen seconds elapsed between when Defendant Smith fired the initial shots and when he fired the final two that hit Plaintiff, ending the chase. <u>See</u> Def. Ex. 19. And, during those thirteen seconds, Plaintiff never showed an intent to submit to police authority. Even though the truck came to a stop, Plaintiff admittedly revved the engine in an apparent attempt to continue his flight and, aside from Plaintiff's conjecture, there is no evidence the officers could have or should have known the car chase, or Plaintiff's threat, had ended. Moreover, after the truck skidded into the ditch, only a few seconds elapsed before Defendant Smith fired the final two shots. <u>See</u> Def. Ex. 19. <u>See also</u> Def. Ex. 18 ¶ 26.

22

In such a rapidly evolving, dangerous situation, Defendant Smith could not have been expected to assess the physical capabilities of the truck or evaluate the likelihood of it getting out of the ditch. Plaintiff's after-the-fact speculation that it was impossible for the truck to continue moving after it landed in the ditch improperly asks the Court to view the situation "with the 20/20 vision of hindsight." See Graham, 490 U.S. at 396. The relevant inquiry is one of objective reasonableness, considering the circumstances and the split-second decision-making officers must make in tense, dangerous situations. Id. at 396-97.

Moreover, Defendant Smith and Officer Kopinski maintain the threat, from their perspective at the time, was not over after Plaintiff's truck landed in the ditch. Indeed, in his response to Plaintiff's request for admissions, Defendant Smith denied that the "ditch's angle and position of the drive tire [sic] was such that it made it unlikely that it could exit the ditch on its own power." See Def. Ex. C ¶ 71. Similarly, Officer Kopinski said in response to a discovery request that he believed "it was possible and reasonably likely that the black truck could have exited the ditch on its own power." See Pl. Ex. E ¶ 36.

Like the circumstances here, when the officers in <u>Plumhoff</u> fired shots at the suspect, the truck was not moving, but the suspect exhibited an intent to continue driving. <u>See</u> 572 U.S. at 776. The Court reasoned as follows:

> [The suspect's] outrageously reckless driving posed a grave public safety risk. And while it is true that [his] car eventually collided with a police car and came temporarily to a near standstill, that did not end the chase. Less than three seconds later, [the suspect] resumed maneuvering his car. <u>Just before the shots were fired</u>, when the front bumper of his car was flush with that of one of the police cruisers, [the suspect] was obviously pushing down on the accelerator because the car's wheels were spinning, and then [the suspect] threw the car into reverse 'in an attempt to escape.' Thus, the record conclusively disproves [his] claim that the chase in the present case was already over when [the officers] began shooting.

<u>Id.</u> at 776-77 (emphasis added). In <u>Plumhoff</u>, the Court explicitly held the officer was justified in shooting while the vehicle's tires were merely spinning given the suspect was clearly attempting to continue his efforts. <u>Id.</u> This is precisely what happened in this case—Plaintiff's truck came to a stop, but his tires were spinning, indicating he was attempting to continue his flight.

Defendant Smith's first round of shots did not clearly incapacitate Plaintiff, force his surrender, or end his threat of continued flight. Instead, like the suspect in <u>Plumhoff</u>, Plaintiff "never abandoned his attempt to flee." <u>Id.</u> at 777. Even though Plaintiff now, after the fact, believes the truck could not possibly have driven out of the ditch, it was reasonable for the officers to have

perceived a continued threat in Plaintiff's clear attempt to keep driving. That the threat of continued flight may not have been "real"—because, as Plaintiff asserts, it would have been impossible to get out of the ditch—does not mean it was not objectively reasonable for Defendant Smith, in the moment and in light of what he knew and witnessed, to have believed it was. See, e.g., Penley, 605 F.3d at 851 (holding the officer's belief that a fake gun was real was objectively reasonable under the circumstances); Pace, 283 F.3d at 1282, 1283 (holding reasonable officers who witnessed the fleeing-suspect's hazardous driving during a long car chase could have perceived the threat was not over even though the suspect's car had come to a stop seconds before officers shot him).

Accepting that Defendant Smith opened the truck door and made eye contact with Plaintiff does not alter the analysis. Indeed, the officer in McCullough, before shooting, made "eye contact" with the suspect through the truck's windshield and told the suspect to show his hands, but the suspect made no effort to comply. See 559 F.3d at 1203. Plaintiff does not contend that, when Defendant Smith opened the door, he had his hands raised, told Defendant Smith he would surrender himself to police, or otherwise indicated he was giving up. On the contrary, Plaintiff, in his own words, "'gunned' the engine in an attempt to flee." See Pl. Resp. at 2. There is no evidence Defendant

Smith, with a brief glimpse inside the truck, was able to deduce that Plaintiff could not have dislodged the truck from the ditch or was no longer a threat. See id.

Finally, accepting as true that neither Defendant Smith nor Officer Kopinski yelled for Plaintiff to show his hands or orally threatened the use of deadly force, the binding precedent does not require an oral warning before officers may use deadly force to end a dangerous car chase.[11] Even more, such a message was communicated to Plaintiff in other ways: both officers pursuing Plaintiff had their lights and sirens activated, which Plaintiff and his passenger recognized at the time. See Pl. Ex. G ¶ 5; Def. Ex. 8 at 32.

Additionally, when Plaintiff drove toward Officer Kopinski's police car, Defendant Smith fired four shots into the back windshield of the truck, see Def. Ex. 19, and when that proved ineffective, Smith walked in the direction of Plaintiff's truck "with his firearm sighted on the driver's side door window," see Pl. Resp. at 2. Any reasonable person would understand—and, in fact, it appears Plaintiff did understand in the moment—that the officers were seeking Plaintiff's surrender with the implied threat of deadly force being used for his failure to do so. Plaintiff even alleges in his complaint that the moment

---

[11] And, in fact, in most instances, a car chase does not lend itself to an oral warning being practical or effective.

26

Defendant Smith exited his patrol car at the end of Bonnieview Road, Smith had "his service weapon displayed," and "show[ed] [an] intent[] [to] use … deadly force." See Am. Compl. at 5-6.

The relevant inquiry under a Fourth Amendment analysis is whether Plaintiff "would have appeared to reasonable police officers to have been gravely dangerous." See Pace, 283 F.3d at 1281. The record amply supports the answer to this inquiry is "yes."[12] Plaintiff's conduct of continuing to flee after Defendant Smith initially fired shots at the back windshield "underscores the point" that Plaintiff was "intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." See Plumhoff, 572 U.S. at 777 (emphasis added).

Given the circumstances Defendant Smith faced and the conduct he observed, the Court cannot conclude his actions were objectively unreasonable. Additionally, even if, for argument's sake, Defendant Smith violated federal law, he is entitled to qualified immunity because he did not violate clearly established federal law. As such, Defendant Smith's motion is due to be granted.

---

[12] The Honorable Robert M. Foster, who sentenced Plaintiff, even characterized the incident as one that "carried a magnitude of seriousness that is almost unique," noting that in his twenty-one years on the bench, he had seen "very few other incidents that compare with [Plaintiff's]." See Def. Ex. 35 at 33-34.

Accordingly, it is

**ORDERED:**

1.      Defendant Smith's motion for summary judgment (Doc. 37) is

**GRANTED**.

2.      The **Clerk** is directed to enter judgment in favor of Defendants

Smith, Lee, and Kopinski, <u>see</u> Order (Doc. 69), terminate any pending motions

as moot, and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 3rd day of March

2021.

_____
BRIAN J. DAVIS
United States District Judge

Jax-6
c:
Randy Scott Lingelbach, Jr.
Counsel of Record